UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LARISSA CYRACUS,

        Plaintiff,

v.                                       Case No.15-C-172

CAROLYN COLVIN,

        Defendant.

## DECISION AND ORDER

Plaintiff filed this action challenging the decision of the Commissioner of Social Security denying her disability benefits. For the reasons given below, the decision of the Commissioner will be remanded for further proceedings.

**I. Background**

Plaintiff suffers from a number of physical conditions, including undifferentiated connective tissue disease and fibromyalgia, and these conditions cause pain, stiffness and fatigue. (R. 369, 373.) She also experienced frequent headaches. These conditions required treatment with physical therapy and periodic steroid injections, as well as a daily regimen of prescription drugs including (at various times) gabapentin, Cymbalta, Methotrexate, Effexor, and hydrocodone as needed. She also used a cane to walk, and a TENS (Transcutaneous Electrical Nerve Stimulation) unit, splints and knee braces at times to help alleviate her symptoms.

For several years the Plaintiff had seen Dr. Gowing, a rheumatologist, for pain and other symptoms, which Dr. Gowing usually attributed more to fibromyalgia than connective tissue

disease. She frequently rated her pain at a 6 or 7 out of 10, and often reported pain and stiffness in the shoulders and back. In 2009 Dr. Gowing noted that her autoimmune condition (connective tissue disease) had worsened since they had taken her off methotrexate. (R. 308.) In 2010 she had problems with "full body pain with significant fatigue," burning in the hands and wrists, difficulty walking and grooming, turning faucets on and off, and she had difficulty getting out of bed. All of these limitations Dr. Gowing attributed to "worsening fibromyalgia." (R. 306.) At her next visit she had severe shoulder pain to the point where she could barely lift her arm to get dressed. (R. 301.) In April 2010 Plaintiff was struggling with chronic widespread pain involving the "shoulders, the hips, knees, ankles, hands, wrists, low back." (R. 297.) She reported that she had been unable to work the previous three weeks because of the fatigue and pain. Dr. Gowing attributed this once again to worsening fibromyalgia rather than her connective tissue disease. (*Id.*) By August 2010 the pain was at an 8 out of 10 and she continued to struggle with chronic fatigue, as well as neck and shoulder pain. (R. 291.) She still had a lot of difficulty doing things like twisting faucets, getting dressed and getting out of a car.

By November 2010 she was experiencing "increasing problems with pain involving the lower extremeties, associated numbness and burning." (R. 287.) Dr. Gowing observed that the Effexor might be contributing to the Plaintiff's worsening headaches, and so they planned to taper off that drug. In February 2011 Dr. Gowing noted that "she has not been doing well," had increasing problems with fatigue, and the pain was at a 9 out of 10. (R. 281.) In her May 2011 visit, she was doing "a little bit better," with pain down to a 6, and Dr. Gowing was going to start her on Cymbalta, a drug used to treat both fibromyalgia and depression. (R. 279.) Ultimately, in June 2012, Dr. Gowing wrote a lengthy letter indicating his belief that the Plaintiff could no longer

2

perform gainful employment, even in a sedentary capacity, due to her deteriorated physical condition. (R. 373.) In particular, Dr. Gowing wrote that "Over the last couple of years she has shown significant functional decline and more widespread chronic pain with involvement of the neck, upper back, shoulders, and lower extremities including the knees and hips." (*Id.*) Dr. Gowing also observed that Plaintiff has been a "hard worker" her whole life and gave it an honest effort to keep working, but was unable to despite its sedentary nature. (*Id.*) This June 2012 letter echoed a shorter statement Dr. Gowing made earlier that year to the same effect. (R. 369.)

In his decision denying benefits, the ALJ stated that he was "well aware" of Dr. Gowing's opinion, which he discussed at some length, but found that it was inconsistent with the "clinical findings, ongoing, contemporaneous out-patient treatment records, and other objective evidence of record." (R. 106.) Ultimately, the ALJ found that the Plaintiff's conditions, along with obesity, were severe impairments but that they imposed no more than mild limitations on the claimant's ability to perform normal work activities. (R. 99.) The ALJ concluded that the Plaintiff could perform light work so long as it did not involve overtly physical activities such as the use of ropes, kneeling, stooping, or frequent reaching or fingering and handling. (R. 100.) Given this residual functional capacity finding, the ALJ concluded that the Plaintiff was not disabled.

**II. Analysis**

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007).

## A. Medical Source Opinions

The Plaintiff first argues that the ALJ erred by giving more weight to the non-examining state agency reviewing physicians than the opinion of her treating rheumatologist, who opined that her limitations were severe enough to preclude work. (R. 373.) Generally, the ALJ must give "controlling weight" to the medical opinion of a treating physician "if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.'" *Larson v. Astrue,* 615 F.3d 744, 749 (7th Cir. 2010) (quoting 20 C.F.R. § 404.1527(c)(2)); see also *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013). If the ALJ does *not* ascribe controlling weight to the physician's opinion, the ALJ must offer "good reasons" for discounting a treating physician's opinion. *Larson,* 615 F.3d at 749. Put another way, "[e]ven though the ALJ was not required to give [the treating physician's] opinion controlling weight, [the ALJ] was required to provide a sound explanation for his decision to reject it and instead adopt [the state agency physician's] view." *Roddy,* 705 F.3d at 636 (citations omitted).

Here, although Dr. Gowing's detailed opinion was certainly "well-supported by medically acceptable . . . techniques," there was other "substantial evidence" in the record that was contrary to the treating source opinion. In particular, the state agency reviewers concluded that Plaintiff could frequently lift 10 pounds, stand or walk about 6 hours in a day, sit for 6 hours, and otherwise had no significant limitations apart from the ability to reach. (R. 343-50.) Dr. Pat Chan concluded in July 2011 that Plaintiff's alleged limitations were only partially credible since she "indicates she is able to walk, drive and ride in the car. She is able to go shopping and help with simple household chores." (R. 350.) That assessment was affirmed by Dr. Walcott in December 2011. These contrary views entitled the ALJ to avoid giving "controlling weight" to Dr. Gowing's opinion.

*Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir. 2008) ("There was evidence—the report of the nonexamining consultant—that contradicted the reports of the treating physicians. So the presumption [of controlling weight] falls out and the checklist comes into play.")

Of course the fact that the treating source opinion was not "controlling" does not mean it could be lightly discounted or ignored. When the treating physician's opinion no longer is controlling, it becomes "just one more piece of evidence for the [ALJ] to weigh." *Hofslien v. Barnhart,* 439 F.3d 375, 376–77 (7th Cir. 2006). Accordingly, he must evaluate the opinion's weight by considering the length, nature, and extent of the claimant's treatment relationships with her physicians, the degree to which the opinion is supported by evidence, the opinion's consistency with the record as a whole, whether the doctor is a specialist, and "other factors." 20 C.F.R. § 404.1527(c).

Here, the ALJ discounted Dr. Gowing's opinion on the grounds that it was inconsistent with the "clinical findings, ongoing, contemporaneous out-patient treatment records, and other objective evidence of record." (R. 106.) These reasons for discounting a treating source would be viable if the treating source had played only a small role in the claimant's treatment, that is, if a treating source's opinion went against the grain of a multitude of other clinical findings and records. But Dr. Gowing was hardly a peripheral figure in the Plaintiff's course of treatment—he was the central figure, the rheumatologist who saw her every three months over several years. Rheumatologists are experts in treating fibromyalgia and connective tissue diseases, which is what Plaintiff suffered from. Dr. Gowing examined her countless times and attempted to treat her with numerous different prescription drugs, steroid shots, and other methods. Because Dr. Gowing's extensive opinions and records *are* the "clinical findings [and] contemporaneous out-patient records" in this case, it is

difficult to understand how Dr. Gowing's opinions could be "inconsistent" with the very medical records he created. Certainly the records from Dr. Gowing are consistent in showing a patient who did not improve significantly with treatment, who consistently rated her pain at high levels, and who continued to have difficulty doing such basic things as twisting doorknobs or dressing herself.

The ALJ did cite one other physician's opinion as contradictory evidence. The ALJ believed that Dr. Gowing's opinion was inconsistent with a December 2012 neurology exam Plaintiff underwent due to pain in her right knee. (R. 106.) This exam, according to the ALJ, found "much greater functioning [than] opined by Dr. Gowing in his assessments. It is further noted that this neurological specialist performed a thorough evaluation, which is more persuasive than those completed by Dr. Gowing, which were supplied by the claimant's representative . . ." (*Id.*)

The neurological exam did not find "much greater functioning" than Dr. Gowing, however. The purpose of the exam, not surprisingly, appears to have been to see if Plaintiff's knee problem had a neurological source, but the neurologist believed the answer was "no," and that her leg pain had an orthopedic genesis. (R. 452.) He noted that Plaintiff suffered from "fatigue, nosebleeds at times, joint pain, weakness, depression, cold intolerance." (R. 451.) The exam showed that her "shoulder shrug" was normal, that muscle mass was normal, her reflexes were normal, and that there was no asymmetry in nerve feeling in her legs. (*Id.*) In other words, she had a normal *neurological* exam—an exam to test her nervous system. This was not an exam testing her functioning or pain. The fact that she did not apparently have any nerve damage or any other neurological reason for her leg pain does not undercut the fact that she was experiencing leg pain, or fibromyalgic pain throughout the rest of her body. Ultimately, the disability question does not turn on the etiology of a claimant's limitations— the *why*— but on the existence or fact of the

6

limitations themselves. In some cases, for example if the claimant had been alleging disability due to a neurological condition like multiple sclerosis, the fact that she passed a neurological exam might undercut her claim. But here, the Plaintiff was alleging pain, weakness, stiffness, etc., due to fibromyalgia, a *non*-neurological disease of chronic pain that was under the treatment of a rheumatologist. Given that she had not alleged a neurological condition, the fact that she passed a neurological exam is not even arguably inconsistent with the symptoms Plaintiff reported to Dr. Gowing, his lengthy treatment notes over several years, or his 2012 opinion of disability, because all the neurological exam concluded was that she had a normal nervous system, something that had never really been in doubt in the first place. If anything, the fact that her leg pain was severe enough that she sought treatment from another specialist *supports* her disability claim. ("Gait was somewhat limping and is due to pain in her right leg.") (R. 451.) In short, when the alleged disability has a rheumatological origin, it is hard to see how a solitary neurological exam could be "more persuasive" than the consistent treatment notes and opinions of the treating rheumatologist.

Finally, I note that the ALJ relied more heavily on the state agency doctors who reviewed the file. It is notable, however, that the 2011 opinions of the state agency reviewers did not have the benefit of Dr. Gowing's 2012 letters supportive of a disability finding. *Noble v. Colvin,* 942 F. Supp. 2d 799, 813 (N.D. Ill. 2013) ("Here, the ALJ failed to provide an adequate explanation for his decision to give the state agency physicians' opinions controlling weight. This is particularly troubling in light of the fact that these opinions were rendered well over a year before the medical assessments of Dr. Mitchell and Dr. Ashley . . .") In particular, Dr. Gowing's lengthy June 2012 letter detailed the Plaintiff's treatment history, the attempts to medicate her, the advances and setbacks, and went so far as to point out that he had "met with Larissa and her family on multiple

7

occasions around the time she quit working." (R. 373.) This is an opinion from a treating rheumatologist who had an intimate, detailed, and longitudinal view of the Plaintiff's abilities, and as such it was not a judgment that could easily have been set aside.

It is hard to see how Dr. Gowing's opinion could have been discounted, but if it were, an ALJ must have adhered to the regulations governing consideration of treating sources. Under 20 C.F.R. § 404.1527(c), these considerations must include all aspects of the treatment relationship, including its length. Here, both the length (7 years) and depth (4 times per year) of the relationship suggest significant deference should be granted. 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.") Added to that is the fact that Dr. Gowing was an expert in fibromyalgia, which appeared to be the most serious of the Plaintiff's issues. 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.") And of course Dr. Gowing was a treating source, too. 20 C.F.R. § 404.1527(c)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."). All of these regulations tip the scales strongly in favor of crediting the treating source's opinion. Of course in some cases it is recognized that treating physicians seek to become advocates for their patients and perhaps are overly eager to support their disability applications, but there is no suggestion of that in this case. In fact, Dr. Gowing's opinion expresses no small amount of regret that the

Plaintiff's condition had deteriorated to such a degree that she could no longer work. (R. 373.)

In sum, in order to overcome the opinion of the treating source specialist who saw the Plaintiff repeatedly for several years, and who gave a detailed account of her condition and limitations, the ALJ would have needed exceptionally strong evidence to the contrary. Neither the neurological exam the Plaintiff passed, nor the opinions of state agency reviewers who rendered opinions without examining the Plaintiff constitute sufficient evidence to discount Dr. Gowing's conclusions.

**B. Credibility**

The Plaintiff also challenges the ALJ's credibility determination. The ALJ's consideration of the treating source is sufficient to warrant remand, and so I need not address credibility in great depth, or at all. *Scott v. Astrue,* 647 F.3d 734, 741 (7th Cir. 2011) ("These flaws are enough to require us to remand the case to the Agency for further proceedings. We therefore needn't decide whether the reasons the ALJ gave in support of her adverse credibility finding regarding Scott were so "patently wrong" as to separately require remand.") For the sake of completeness, however, it is worth addressing the credibility determination because that determination was a key "leg" in the ALJ's denial of benefits.

"So long as an ALJ gives specific reasons supported by the record, we will not overturn his credibility determination unless it is patently wrong." *Curvin v. Colvin,* 778 F.3d 645, 651 (7th Cir. 2015). Here, the ALJ found as follows:

> Despite alleging a total inability to work and indicating that she was very limited in what she could do, the claimant reported she was able to care for her children, including her daughter with special needs. She reported she was able to get them off to school each day but she required assistance with some of her own personal care. The claimant also reported she was able to prepare simple meals for her family and

9

>    do some light housekeeping chores. In addition, the claimant reported she spent several hours each day on her computer or smart phone checking her e-mail and Facebook accounts and she was able to attend church and some Bible study during the week. She reported she was able to go shopping for groceries, clothes, and her household; handle her finances; go for walks; go out to visit friends and family; and she enjoyed going to the lake or beach. The claimant reported she could follow spoken and written instructions. Certainly these are not the activities and abilities of an individual, who is completely unable to engage in any substantial gainful activity . . .

(R. 105.)

A fair summary of the above is that the claimant is able to move about with some frequency, communicate with others, use computers, and visit. But the fact that she is not a bed-ridden vegetable does not mean she can work 40 hours a week. I may take judicial notice that many parents (particularly mothers, perhaps) will go to almost any length to care for their children and see them "off to school." (*Id.*) Thus, the fact that one's children get to school on time cannot be reliably indicative of one's limitations in the workplace. That she can take a walk, go shopping, and use the computer does not mean she could sit at a desk using a computer for eight hours a day. "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons (in this case, [claimant's] husband and other family members), and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012).

The ALJ's conclusions might have derived in part from Dr. Chan's analysis, which makes the same error. Dr. Chan, the state agency reviewer, concluded that the Plaintiff was only partially credible because she "indicates she is able to walk, drive and ride in the car. She is able to go shopping and help with simple household chores." (R. 350.) But the Plaintiff had never claimed

10

otherwise, and being able to walk, or ride in a car are not inconsistent with disabling fibromyalgia. Even individuals with unquestionably severe disabilities can sometimes walk or ride in cars, just as they might be able to perform "simple" chores around the house. Dr. Chan's conclusion is merely a reflection of the fact that the claimant is not completely helpless, but the goalposts for obtaining disability benefits are not so dire. The fact that the claimant was not completely immobilized is not a reason to discount her credibility.

Here, the record suggests the Plaintiff had a sedentary job at a prison but still could not perform it, and so ultimately she left the job. It's always possible that she was exaggerating, but that is less likely when a person leaves a solid job because one does not generally leave gainful employment (particularly with children) in the vague hope that one's disability claim will come to fruition years later. It is true that the claimant also had other disability insurance, which caused the ALJ to speculate that "the claimant may not have financial motivation to return to work." (R. 105.) But that possibility must be weighed against Dr. Gowing's statement that Plaintiff had been a "hard worker" her whole life and made an honest effort to keep working, but found it impossible. (R. 373.) These aspects of the credibility determination do not withstand scrutiny, and should be reconsidered on remand.

**III. Conclusion**

For the reasons given above, the decision of the Commissioner is remanded for further proceedings consistent with this opinion. The clerk will enter judgment accordingly.

**SO ORDERED** this 2nd day of March, 2016.   /s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

11